## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**CENTER FOR BIOLOGICAL DIVISION**,

           Plaintiff,

      v.

**REBECCA M. BLANK**, **Acting Secretary, U.S. Department of Commerce**, *et al.*,

           Defendants.

</td><td>

Civil Action No. 11-cv-2307 (RLW)

</td></tr>
</table>

## MEMORANDUM OPINION

The Center for Biological Diversity ("Center") initiated this action against the Secretary of Commerce,[1] the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Service ("Fisheries Service" or "NMFS"), seeking review of a final rulemaking issued by the Fisheries Service to modify several management measures for the western Atlantic bluefin tuna fishery. *See Atlantic Highly Migratory Species: Adjustments to the Atlantic Bluefin Tuna General and Harpoon Category Retentions*, 76 Fed. Reg. 74,003 (Nov. 30, 2011) (the "Final Rule"). The Center mounts challenges to the Final Rule under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), 16 U.S.C. §§ 1801, *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et. seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.* This matter is presently before the Court on the parties' cross-motions for summary judgment. (Dkt. Nos. 16, 23). Upon careful consideration of the parties' briefing and a thorough review of the Administrative Record, the Court concludes, for the reasons set forth herein, that the Center's Motion for

---

[1] The Center originally sued former Secretary John E. Bryson, but Acting Secretary Blank is substituted as the named defendant under Federal Rule of Civil Procedure 25(d).

Summary Judgment will be **DENIED**, and that the Defendants' Cross-Motion for Summary Judgment will be **GRANTED**.

## BACKGROUND

Atlantic bluefin tuna are highly migratory fish that range across most of the North Atlantic Ocean and its adjacent seas. Bluefin tuna have a lifespan of about 40 years, grow to more than ten feet in length, and can weigh up to 1,500 pounds. The global bluefin tuna population is comprised of two distinct stock categories—(1) the Eastern Atlantic and Mediterranean population, which spans from Norway to Africa and into the Mediterranean Sea; and (2) the Western Atlantic population, which spans from Newfoundland to the Gulf of Mexico—although the two stocks are known to mix to some extent.[2]

In the United States, Congress regulates the commercial bluefin tuna fishery through a patchwork of statutory and regulatory laws administered by the Fisheries Service, pursuant to authority delegated by the Secretary of Commerce. Presently, the Fisheries Service manages the bluefin tuna fishery in accordance with the 2006 Consolidated Atlantic Highly Migratory Species Fishery Management Plan ("2006 HMS FMP"), 71 Fed. Reg. 58,058 (Oct. 2, 2006), which contains a wide range of management and allocation measures, including annual quota and subquota limits, permit requirements for commercial fishers, time and area closures delineating fishing seasons, daily retention limits for most categories of fishermen, and more.

Through this action, the Center seeks review of the Fisheries Service's recent modification to some of these management measures. Notably, the Final Rule at issue in this

---

[2] As set forth in the Administrative Record, the full extent of mixing between the two stocks is currently unknown, although the issue—and the extent of bluefin tuna's ability to migrate across the ocean more generally—remains the subject of significant research and study. (*See* Administrative Record ("AR"), H6 at 82; AR, H8 at 6, 11, 14). The Court also notes that bluefin tuna are sometimes referred to throughout the Administrative Record, and, consequently, some places in this opinion, as "BFT."

case did *not* change the annual quota or subquota limits for the U.S. bluefin tuna fishery. Those limits were modified by an earlier rulemaking, whereby the Fisheries Service adjusted the overall U.S. quota limit to conform to recommendations of the International Commission for the Conservation of Atlantic Tunas, and adjusted the subquota limits for each fishing category. *Atlantic Bluefin Tuna Quotas and Atlantic Tuna Fisheries Management Measures*, 76 Fed. Reg. 39,019 (July 5, 2011). Instead, the Final Rule made adjustments to several effort-control management measures for the fishery: (1) an increase to the "General" category maximum daily retention limit; (2) an extension of the "General" category fishing season; and (3) an increase to the "Harpoon" category daily incidental retention limit. These three changes, which are discussed in greater detail below, form the basis for the Center's challenges in this case.

### A. Statutory and Regulatory Framework

#### 1. <u>The Magnuson-Stevens Act</u>

Congress passed the Magnuson-Stevens Act to establish a national program for the conservation and management of the Nation's fishery resources. Congress believed that the implementation of such a program was needed "to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." 16 U.S.C. § 1801(a)(6). In turn, Congress empowered the Secretary of Commerce with "authority to create national programs for the conservation and management of fishery resources." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1557 (D.C. Cir. 1991); *see also Kramer v. Mosbacher*, 878 F.2d 134, 135 (4th Cir. 1989) (explaining that the Secretary holds "broad authority to manage and conserve coastal fisheries").

Under the Magnuson-Stevens Act, eight regional councils are charged with drafting and preparing "fishery management plans," 16 U.S.C. § 1852(h), that must set out measures

"necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A).[3]  Acting through the Fisheries Service, the Secretary then reviews the plans and their implementing regulations for compliance with the Act, solicits public comment, and publishes final regulations in the Federal Register. *Id.* § 1854(a)(1), (b)(1).  Final implementing regulations, once promulgated by the Secretary, have the full force and effect of law. *See generally id.* §§ 1854, 1855.

All fishery management plans—along with any regulations implementing those plans—must be consistent with ten "National Standards" set forth in the Magnuson-Stevens Act. *Id.* § 1851(a).  At issue in this case are two of these standards:

> (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield[4] from each fishery for the United States fishing industry.

> (2) Conservation and management measures shall be based upon the best scientific information available.

---

[3]      Under the statute, "overfishing" means "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  16 U.S.C. § 1802(34).  A stock is considered "overfished" when "its biomass has declined below a level that jeopardizes the capacity of the stock or stock complex to produce MSY on a continuing basis."  50 C.F.R. § 600.310(e)(2)(i)(E).  "Maximum sustainable yield" ("MSY") is defined as "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery technological characteristics (e.g., gear sensitivity), and the distribution of catch among fleets." *Id.* § 600.310(e)(1)(i).  In other words, MSY is, theoretically, the largest catch that can be taken from a species' stock over an indefinite period.

[4]      "Optimum yield" is defined as "the amount of fish which – (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." 16 U.S.C. § 1802(33).

*Id.* § 1851(a)(1), (2).[5]  Along with these National Standards, several other provisions of the Act are relevant to this matter.  First, when a fishery is identified as "overfished," as here, the Secretary must take action to "end overfishing in the fishery and to implement conservation and management measures to rebuild affected stocks of fish."  *Id.* § 1854(e)(2).  The "rebuilding" period generally should not exceed ten years, except where "management measures under an international agreement in which the United States participates dictate otherwise."  *Id.* § 1854(e)(4)(A)(ii).  Second, "with respect to a highly migratory species for which the United States is authorized to harvest an allocation, quota, or at a fishing mortality level under a relevant international fishery agreement," such as bluefin tuna, the Act directs that the Secretary shall "provide fishing vessels of the United States with a reasonable opportunity to harvest such allocation, quota, or at such fishing mortality level."  *Id.* § 1854(g)(1)(D).

### 2.  The Atlantic Tunas Convention Act

Along with the Magnuson-Stevens Act, the Atlantic Tunas Convention Act ("ATCA") provides the Secretary with additional authority to promulgate conservation and management programs for tuna fisheries.  Congress enacted the ATCA as domestically-implementing legislation for the International Convention for the Conservation of Atlantic Tunas (the "Convention"), 20 U.S.T. 2887, T.I.A.S. 6767 (1969).  *See* S. Rep. No. 94-269, *reprinted in* 1975 U.S.C.C.A.N. 742, 745 (explaining that the ATCA was "needed to provide an overall conservation program, agreed to on an international basis, for the conservation of the highly

---

[5]     In its Complaint, the Center also asserted a challenge under National Standard Nine, (Dkt. No. 1 ("Compl.") at ¶¶ 86-91), which dictates that any conservation and management measures shall "minimize bycatch" and the "mortality of such bycatch."  16 U.S.C. § 1851(a)(9). But because the Center fails to press this claim whatsoever through any of its summary judgment briefing, the Court finds that it has abandoned any claim under National Standard Nine.  *See, e.g.*, *Hainey v. Dep't of Interior*, --- F. Supp. 2d ---, 2013 WL 659090, at *8 n.8 (D.D.C. Feb. 25, 2013); *Marinette Marine v. U.S. Coast Guard*, 973 F. Supp. 1, 4 n.7 (D.D.C. 1997).

migratory tunas, and to carry out U.S. responsibilities under the Convention").  The Convention

established the International Commission for the Conservation of Atlantic Tunas ("ICCAT"),

and ICCAT "on the basis of scientific evidence make[s] recommendations designed to maintain

the populations of tuna and tuna-like fishes that may be taken in the Convention area at levels

which will permit the maximum sustainable catch."  Convention, ART. VIII, § 1(a).  To this end,

ICCAT establishes a "total allowable catch" ("TAC") for western Atlantic bluefin tuna, and a

portion of that stock is then allocated to the United States.  Under the ATCA, the Secretary may

not promulgate any regulations that "may have the effect of increasing or decreasing any

allocation or quota of fish or fishing mortality level to the United States agreed to pursuant to a

recommendation of [ICCAT]."  16 U.S.C. § 971d(c)(3)(K).  Otherwise, any regulations issued

under the ATCA "shall, to the extent practicable, be consistent with fishery management plans

prepared and implemented under [the Magnuson-Stevens Act]."  *Id.* § 971d(c)(1)(C).

### 3.  The National Environment Policy Act

NEPA is designed to "promote efforts which will prevent or eliminate damage to the

environment and biosphere."  42 U.S.C. § 4321.  To achieve that goal, Congress directed,

through NEPA, that all federal agencies must prepare an environmental impact statement ("EIS")

for all "major Federal actions significantly affecting the quality of the human environment."  *Id.*

§ 4332(2)(C); *Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003).  To determine

whether an EIS must be drafted, however, the agency must first prepare an environmental

assessment ("EA").  40 C.F.R. § 1501.4(b).  The assessment must "[b]riefly provide sufficient

evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant

impact."  *Id.* § 1508.9(a)(1); *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir.

1987).  The EA must also discuss the need for the proposal, the alternatives to the proposed

action, and the environmental impacts of the proposed action.  40 C.F.R. § 1508.9(b).  Following

the completion of the EA, if the agency determines that the proposed action will have no

significant environmental impacts, then the agency prepares a finding of no significant impact

("FONSI"), which completes the NEPA process without the need for a more comprehensive EIS.

*Id.* §§ 1501.4(e), 1508.13.

### B.   Factual and Procedural Background

### 1.   The July 2011 Rule: NMFS's Adjustments to Bluefin Tuna Quotas

In July 2011, the Fisheries Service issued a final rule modifying the U.S. commercial

bluefin tuna quota and subquotas for all commercial fishing categories in the United States.

*Atlantic Bluefin Tuna Quotas and Atlantic Tuna Fisheries Management Measures*, 76 Fed. Reg.

39,019 (July 5, 2011); (*see also* AR, G9).  While these quota adjustments are not the subject of

the Center's claims in this case (and, indeed, any such challenge would now be time-barred

under the applicable provisions of the Magnuson-Stevens Act), the nature of parties' arguments

calls for a brief summary of the circumstances surrounding the quota adjustments.

In adjusting the overall U.S. quota level through this earlier rule, the Fisheries Service

adopted the ICCAT-recommended quota.  (AR, G7; AR, G9).  ICCAT's quota recommendations

were based on information compiled through the 2010 Report of its Standing Committee on

Research and Statistics ("SCRS"), including a recent 2010 bluefin tuna stock assessment for both

the eastern and western Atlantic stocks.  (AR, H6 at 75-99).  ICCAT's proposals were also

consistent with its 20-year rebuilding plan, initially implemented in 1998 to rebuild the bluefin

tuna stock to maximum sustainable yield "with at least 50% probability."  (AR, H6 at 83).  As

with prior stock assessments, the management recommendations in the 2010 SCRS Report were

based on two hypotheses concerning future recruitment: a "low recruitment scenario," pursuant

to which bluefin stock is already rebuilt, and a "high recruitment scenario," pursuant to which bluefin stock has "a very low probability" of being rebuilt. (*Id.*).[6]  ICCAT concluded "that there [was] no strong evidence to favor either the low or high recruitment scenario over the other." (AR, G7 at 1).  Nevertheless, the SCRS Report indicated that under either recruitment scenario, a total allowable catch of western Atlantic bluefin of 1,800 metric tons "should allow the biomass to continue to increase."  (AR, H6 at 83).  In view of the rebuilding program's objectives, however, ICCAT adopted an even more conservative approach, implementing a total allowable catch of 1,750 metric tons for western Atlantic bluefin for the 2011 and 2012 fishing years. (*See* AR, G7).

Thereafter, the United States implemented the ICCAT-recommended quota, through which the U.S. was allocated a total base quota of 923.7 metric tons.  (AR, G7 at 2; AR, G9 at 3).[7]  In short, the quota level is the total amount of bluefin tuna that the entirety of the commercial fishery can collectively harvest, (*see* Dkt. No. 23-1 ("Defs.' Mem.") at 10), and within that overall cap, each segment or category of the commercial fishery is allocated a subquota, (*see* AR, G9 at 2-3).  For 2011 and 2012, the General and Harpoon categories were allocated 47.1% and 3.9% shares, respectively, of the overall baseline quota.  (AR, G9 at 3-4).[8] In addition, the 435.1 metric ton baseline for the General category was further subdivided into

---

[6]    "Recruitment" is the number of fish that enter a certain age class.  *See* Marian Macpherson & Mariam McCall, *Judicial Remedies in Fisheries Litigation: Pros, Cons, and Prestidigitation*, 9 OCEAN & COASTAL L.J. 1, 19 n.98 (2003) ("The term 'recruitment rate' refers to the rate at which additional fish enter the population in question.").

[7]    Along with the United States, Canada, Japan, the United Kingdom (*vis-à-vis* Bermuda), France (*vis-à-vis* St. Pierre et Miquelon), and Mexico are also allocated a portion of the total western Atlantic stock.  (*See* AR, G7, at 2).

[8]    As the name implies, the "Harpoon" category consists of fishers using harpoon gear.  The "General" category is comprised of fishermen who principally use other forms of handgear, such as rod and reel and handline equipment, to land bluefin tuna.  Combined, these two categories comprise about 50% of the U.S. commercial bluefin tuna fishery.  (AR, G9 at 3-4)  Other categories include "Angling," "Purse Seine," "Longline," and "Trap" fishermen. (*Id.*).

subquotas for the January, June-August, September, October-November, and December time periods. (*Id.*). With limited exceptions not applicable here, once the quota or subquota level for a fishery is reached, or is projected to be reached, the Fisheries Service must close the fishery, and fishing is prohibited until the opening of the next quota or subquota period. 50 C.F.R. § 635.28(a)(1). The final rule implementing these quota levels was published on July 5, 2011. (*See* AR, G9).

### 2. **The Final Rule: NMFS's Adjustments to General and Harpoon Category Retention Limits and Extension of the General Category Season**

Along with and in addition to quota levels, the Fisheries Service manages the bluefin tuna fishery through a variety of other management measures, sometimes referred to as "effort controls." For example, the Fisheries Service requires commercial fishers to obtain appropriate licenses and permits, which limit who can catch bluefin. *See* 50 C.F.R. § 635.4. The Fisheries Service sets fishing seasons and issues closures of fisheries, which controls when (and, in some cases, where) bluefin tuna are landed. *Id.* § 635.28. Further, and particularly relevant to this case, the Fisheries Services imposes retention limits for different fishing categories, which restrict the number of bluefin tuna that can be landed and retained during a single fishing trip. *Id.* § 635.23. The Fisheries Service also retains the ability to modify or adjust many of these management measures, as appropriate, during the course of each fishing season. *Id.* § 635.34.

Through this lawsuit, the Center challenges the Fisheries Service's modification of several of these other measures. More specifically, the Fisheries Service implemented three changes to its bluefin tuna effort controls through the Final Rule: (1) increasing the General category daily "retention limit"; (2) extending the General category fishing season to remain open until the January subquota is reached, or until the end of March, whichever occurs earlier; and (3) increasing the Harpoon category daily incidental "retention limit." (*See* AR, E13).

First, the Final Rule modified the General category maximum possible daily retention limit.[9] (AR, E13 at 2).  As explained by the Fisheries Service:

> Effort controls, such as daily retention limits . . . are meant to maximize the opportunity for catching the quota and achieving biological, social, and economic benefits while balancing relative costs and negative impacts.  For example, certain effort controls might provide more flexibility for the fishery by increasing retention limits when fish are known to be available on the fishing grounds in certain areas, and then reducing limits at other times so that limited quota may be available to other areas at other times.

(AR, A9 at 2).  Under prior regulations, the default daily retention limit for General category fishermen was one fish per vessel, although the Fisheries Service retained the ability to increase or decrease that limit, from as low as zero to a maximum of three fish per vessel.  (*Id.*).  Such in-season changes are based on a variety of factors set forth in the regulations, all designed to ensure careful and judicious management of the fishery.  *See* 50 C.F.R. § 635.27(a)(8) (summarizing criteria).  Through the Final Rule, the Fisheries Service increased the maximum possible daily retention limit to five fish per vessel, with the intent of "increas[ing] opportunities to harvest the General category quota."  (AR, A9 at 2-3; AR, E13 at 2).

Second, the Final Rule authorized an expansion of the General category fishing season for the January subquota, which is alloted approximately 5.3% of the total General category base subquota.  (AR, E13 at 2; AR, G9 at 3 (allocating 23.1 out of 435.1 metric tons to the January subquota)).  Under prior regulations, the January subquota season closed at the end of January, regardless of whether the subquota amount had been fully harvested.  (AR, A9 at 3).  Through the proposed rule, the Fisheries Service contemplated allowing the General category season to remain open until the January subquota of bluefin was fully harvested.  In other words, the

---

[9]     The term "daily retention limit" is somewhat of a misnomer.  In practice, the retention limit governs the maximum number of bluefin that can be landed or retained during a single fishing trip, regardless of its length.  *See* 50 C.F.R. § 635.23(a)(3) ("Regardless of the length of a trip, no more than a single day's retention limit of large medium or giant BFT may be possessed or retained aboard a vessel that has a General category Atlantic Tunas permit.").

General category season would close when the full January subquota was reached, or on May 31st, whichever came first.  (*Id.*).  Based on feedback received during the notice and comment process, however, the Fisheries Service abbreviated this potential extension; through the Final Rule, the General category season was adjusted such that it would remain open until the January subquota was reached, or until March 31st, whichever comes first.  (AR, E13 at 2).  In considering this action, the Fisheries Service explained that the change "may result in a shift in BFT landings, both temporally (to later in the season) and geographically to the South (i.e., off the South Atlantic states of North Carolina, South Carolina, Georgia, and the Florida East Coast).  However, the number of BFT harvested from the large medium and giant size classes would remain consistent with the levels of BFT mortality used in the stock assessment."  (*Id.*).  Moreover, the Fisheries Service predicted that, practically speaking, "this action effectively would lengthen the General category season by a few weeks."  (AR, A9 at 4).  In fact, for the January 2012 fishing subquota period, the Fisheries Service closed the General category fishery on January 22, 2012.  (AR, S19).

Third, the Final Rule increased the Harpoon category daily incidental retention limit from two to four fish per vessel.  (AR, E13 at 2).  This action was intended to "provide Harpoon category vessels a reasonable opportunity to harvest the allocated Harpoon category quota in its designated time frame and convert dead discards to landings."  (AR, A9 at 4).

Notably, the Fisheries Service issued the proposed rule on November 9, 2009, which meant that the original comment period ran through December 21, 2009.  (*See* AR, A9).  However, in order to provide additional opportunities for the public and other interested parties to comment on the proposed rule, the Fisheries Service subsequently extended the comment period through March 31, 2010.  (*See* AR, B3).  The Fisheries Service then postponed the

implementation of the Final Rule pending two further developments: (1) the completion of the 2010 SCRS stock assessment, discussed above; and (2) a final determination by the Fisheries Service on a petition to list Atlantic bluefin tuna as endangered or threatened under the Endangered Species Act.  (AR, E13 at 1).  With respect to the latter, the Fisheries Service issued its listing determination on June 1, 2011, and found that bluefin did not merit listing as "endangered or threatened, although the Fisheries Service did add bluefin tuna to its "Species of Concern" list.  (AR, H8 at 13-15).

Ultimately, the Final Rule was published on November 30, 2011, and the Center initiated this action one month later, on December 30, 2011.

## ANALYSIS

### A.  Standard of Review

Regulations promulgated under the Magnuson-Stevens Act are subject to review pursuant to Section 706(2) of the APA.  16 U.S.C. § 1855(f)(1); *Oceana, Inc. v. Locke*, 670 F.3d 1238 (D.C. Cir. 2011); *C & W Fish Co.*, 931 F.2d at 1562.[10]  Under the APA, a court must set aside agency action as unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  The "arbitrary and capricious" standard of review is a narrow one, and it is well established that "a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court must be satisfied that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.*; *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032,

---

[10]    The Act requires that any action seeking judicial review under the Magnuson-Stevens Act must be filed within 30 days after the challenged regulation is promulgated or the challenged action is published in the Federal Register.  16 U.S.C. § 1855(f)(1).

1036 (D.C. Cir. 2012). While a reviewing court must conduct a "searching and careful" review, the agency's action remains "entitled to a presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and the Court "will not second guess an agency decision or question whether the decision made was the best one," *C & W Fish Co.*, 931 F.2d at 1565. More specifically, in reviewing challenges under the Magnuson-Stevens Act, the Court's "task is not to review *de novo* whether the [regulation] complies with" the Act's National Standards, "but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *Id.* at 1562; *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). Indeed, "[j]udicial review of agency action under the [Magnuson-Stevens Act] is especially deferential." *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007) (citing *Alliance Against IFQs v. Brown*, 84 F.3d 343, 345 (9th Cir. 1996)); *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990) ("It is . . . especially appropriate for the Court to defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.").

## B.  Article III Standing

Before turning to the merits of the Center's challenges to the Final Rule, the Court first dispatches with a threshold argument advanced by the Fisheries Service—that the Center lacks standing to pursue its claims in the first place.

"Standing to sue is a threshold question." *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 876 (D.C. Cir. 2006). The doctrine of standing derives from Article III of the Constitution, which "confines the federal courts to adjudicating actual cases and controversies."

*Allen v. Wright*, 468 U.S. 737, 750 (1984).  To satisfy the "irreducible constitutional minimum of standing" under Article III, a party must show: (1) that it has suffered an "injury in fact"—an actual or imminent invasion of a legally-protected, concrete, and particularized interest; (2) a causal connection between the alleged injury and the defendant's conduct at issue; and (3) that it is "likely," not "speculative," that the injury "will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "This triad . . . constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998).  To establish standing at the summary judgment stage, a party "cannot rest on 'mere allegations' but must establish each element of standing by putting forth 'specific facts.'"  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) (quoting *Lujan*, 504 U.S. at 561).

        In this case, the Center asserts that its members' "recreational, aesthetic, and professional interests in the bluefin tuna" will be jeopardized by the Final Rule because, from the Center's perspective, the measures enacted through the Final Rule increase overfishing and jeopardize the sustainability of the bluefin tuna population.  (Dkt. No. 25 ("Pl.'s Opp'n") at 7).  The Center submitted affidavits from some of its members in support of this theory.  (*See* Dkt. No. 16-2 ("Galvin Decl.") at ¶ 12 ("[T]he Center for Biological Diversity and its members have interests which would be adversely affected and harmed by continued overfishing of bluefin under the unlawful regulations promulgated by the Defendants."); Dkt. No. 16-3 ("Keats Decl.") at ¶ 15 ("I believe that the Fisheries Service's final rule, by allowing expanded overfishing of the species,

fails to protect the species and ensure that it does not go extinct.")).[11]   It is well settled that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing."   *Lujan*, 504 U.S. at 562-63; *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986); *Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 52 (D.C. Cir. 1988).   Inasmuch as the Center credibly contends that those interests will be impaired because of the measures implemented through the Final Rule—i.e., that, in its view, more bluefin tuna will be killed because of the Fisheries Service's changes in effort controls— the Court finds that the Center has articulated an actionable injury sufficient to establish standing.

The Fisheries Service argues otherwise, insisting that the Center's standing theory is "based on a false premise." (Defs.' Mem. at 20).   In its view, the Final Rule will not cause increased fishing because the quota and subquota levels were not impacted by the Final Rule— the quota levels remained unchanged both before and after the Final Rule was promulgated. Because U.S. fisherman can continue to catch bluefin tuna "up to the already-established limit," the Fisheries Service posits, the Center cannot demonstrate that the measures at issue in this case will result in a decrease in the bluefin tuna population or otherwise jeopardize the bluefin tuna stock.  (*Id.*).   While true that the Final Rule did not make any changes to quota levels—a point the Center rightly concedes—this does not rule out the possibility that the measures implemented through the Final Rule might nevertheless cause an increase in fishing effort and a rise in bluefin tuna mortality, within the bounds of that overall quota.   Indeed, the Final Rule itself expressly

---

[11]     The Fisheries Service attacks the Center's reliance on Mr. Keats' declaration in particular, arguing that he attests to "unauthorized" and illegal activity in "hand-wrangling" a bluefin tuna off the coast of Cape Cod, Massachusetts. (Defs.' Mem. at 20 n.12).  For purposes of this decision, however, the Court need not and does not express any opinion as to the legality of the activities recounted in Mr. Keats declaration.

states that its purpose is to "enable more thorough utilization of the available U.S. BFT quota," (AR, E13 at 1), particularly given that the General and Harpoon categories only landed an average of 77% and 68% of their quotas, respectively, in the three years preceding the passage of the Final Rule, (AR, E13, at 2).  Even if the modified effort controls implemented in the Final Rule only result in a 1% increase in bluefin landings, more bluefin tuna will have been caught because of the Final Rule.  Whether or not this possibility runs afoul of the Magnuson-Stevens Act by failing to prevent "overfishing" within the meaning of the statute is a separate question, and one that bears on the merits of the Center's challenges.  But therein lies the overall problem with the Fisheries Service's standing argument—it is bound up in the merits of this case, and the Court cannot wade into those waters at this stage.  *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)  ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) ("[W]e assume for purposes of standing that an appellant will ultimately receive the relief sought.").  Thus, at least for purposes of standing, the Court must assume that the claimed increase in fishing effort will result in greater fishing mortality, and as a result, the Center has established the requisite injury-in-fact to satisfy Article III.

The same is true with respect to the Center's ability to meet the causation and redressability prongs of the standing analysis.  The Center has explained how its claimed injury is "fairly traceable" to the Final Rule at issue, and that it is "likely, as opposed to merely speculative," that its claimed injury would be redressed by a favorable decision from this Court. *Lujan*, 504 U.S. at 561; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).  According to the Center, the increased fishing effort and bluefin mortality is the result of

the modified management measures implemented through the Final Rule, and, if the Court were to invalidate the Final Rule, those impacts would be nullified. The Fisheries Service's only arguments to the contrary are premised on the same misplaced theory—that the Final Rule does not actually result in increased fishing because the overall quota limitations have remained constant. The Court disagrees that those arguments undermine the Center's standing for the reasons stated. To reiterate, however, whether or not the Center's allegations establish that the Fisheries Service failed to prevent overfishing is another matter entirely that the Court addresses below in analyzing the substantive merit of the Center's claims.

In short, the Center possesses Article III standing to proceed with its claims.[12]

## C. Subject Matter Jurisdiction

Relatedly, the Fisheries Service also argues that the Court lacks subject matter jurisdiction to hear the Center's claims because, in its view, this lawsuit is essentially a challenge to the Fisheries Service's overall management plan for the bluefin fishery and, in particular, the July 2011 rulemaking that implemented the ICCAT-recommended quota. (Defs.' Mem. at 24-28). Because those regulations were enacted as part of earlier rulemakings, the Fisheries Service maintains, the Center's claims are time-barred under the Magnuson-Stevens Act, which generally requires challenges under the Act to be brought "within 30 days after the date on which the regulations are promulgated." 16 U.S.C. § 1855(f)(1). This time limit has been construed as jurisdictional. *See, e.g.*, *Norbid Fisheries v. Nat'l Marine Fisheries Serv.*, 112 F.3d 414, 416

---

[12]    The Fisheries Service does not challenge the Center's ability to assert organizational standing on behalf of its members. The Court therefore does not dwell on this issue, but notes that it has satisfied itself that the Center meets the applicable test for organizational standing, in that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Humane Soc'y*, 840 F.2d at 53.

(9th Cir. 1997) ("[Section] 1855(f)(1) deprives the district court of jurisdiction to hear an attack on the regulations if review is not sought within 30 days of their promulgation"); *Kramer*, 878 F.2d at 137 (similar).   The Fisheries Service's concerns are not altogether misplaced, and the Court agrees that many of the Center's arguments seem an effort to bootstrap challenges to the bluefin quota limits onto its arguments against the Final Rule.   But to the extent that the Fisheries Service is arguing that the Center's challenge is untimely because it "implicates" measures passed through an earlier rulemaking, this theory sweeps too broadly.   According to the Center, its claims are focused on "the Final Rule regarding retention limits and fishing seasons (i.e. effort controls)," (Pl.'s Opp'n at 12), and there is no dispute that the Center timely initiated this action to challenge the Final Rule and the effort control measures implemented therein.   The Court is mindful of the jurisdictional boundaries of the Center's claims in this case and confines its review accordingly.   But contrary to the Fisheries Service's contention, the Center's case was timely filed under § 1855(f)(1), and the Court has jurisdiction over this action.

### D.  The Final Rule's Compliance With The Magnuson-Stevens Act

#### 1.  <u>National Standard One</u>

The Center first asserts that the Final Rule violates National Standard One of the Magnuson-Stevens Act, which mandates that fishery management plans—as well as regulations promulgated to implement fishery management plans—"shall *prevent overfishing* while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1) (emphasis added).   The Center argues that the Final Rule "flouts" National Standard One's directive to prevent overfishing because, in the Center's view, "the Final Rule increases fishing for an overfished species currently subject to overfishing."   (Dkt. No. 16-1 ("Pl.'s Mem.") at 7-8).   According to the Center, the Fisheries

Service failed to "explain how the Final Rule minimizes overfishing" and "dodge[d] its statutory duty . . . by simply assuming that the international [ICCAT] quota will prevent overfishing and insure rebuilding of the stock." (*Id.* at 8, 10). In fact, from the Center's perspective, the Fisheries Service failed to even "evaluate whether the measure prevents overfishing" or conduct any meaningful analysis on this point in the first place. (*Id.* at 8).

The Fisheries Service maintains otherwise. It insists that the Final Rule prevents overfishing precisely because it conforms to the ICCAT rebuilding program and is fully consistent with the ICCAT-recommended quota. (Defs.' Mem. at 28). The Fisheries Service emphasizes that the measures implemented by the Final Rule are all discrete, incremental effort controls used to manage the bluefin tuna fishery, which only impact "<u>when</u> and <u>where</u> bluefin tuna mortality occurs, and do[] not increase the total amount allowed to be harvested." (*Id.* at 29 (quoting AR, E7 at 1)) (emphasis in original). It explains that "[t]he challenged rule gives NMFS management flexibility to improve distribution of the ICCAT-recommended quota across geographic areas and time periods," but does not increase overall fishing effort or mortality. (*Id.*). By contrast, the Fisheries Service stresses, just a few months prior to issuing the Final Rule, it did adjust the overall U.S. bluefin quota through an earlier rulemaking and, in so doing, specifically concluded that its adoption of the ICCAT-recommended quota level was consistent with National Standard One's directive to prevent overfishing. (*Id.*). Because the Final Rule did not increase this overall quota level, but simply adjusted three effort control measures within that quota limit—and, even then, only as applied to a limited percentage of the commercial bluefin industry—the Fisheries Service contends that it reasonably and rationally determined these changes to be fully consistent with its obligation to prevent overfishing. On balance, the Court

concludes that the Administrative Record rationally supports the Fisheries Service's determination.

To begin with, the Center's assertion that the Fisheries Service did not even evaluate whether the Final Rule prevents overfishing is completely belied by the Administrative Record. The Administrative Record is replete with examples of the Fisheries Service's consideration about whether the modifications prevented overfishing and were consistent with the overall rebuilding program for bluefin tuna. First, the summary of the proposed rule, published in November 2009, explained that the modifications were designed "to enable more thorough utilization of the available U.S. BFT quota, *while ending BFT overfishing*, *rebuilding the BFT stock by 2019*, and minimizing bycatch mortality to the extent practicable." (AR, A9 at 1) (emphasis added). The proposed rule went on to explain that "NMFS proposes this action to increase fishing opportunities for BFT within the existing U.S. quota . . . . *These three effort controlling actions would affect only when and where BFT mortality occurs, and not the magnitude*." (AR, A9 at 2) (emphasis added). Thus, in the Fisheries Service's estimation, "[a]s long as the U.S. quota [was] not exceeded and there is no significant change in the selectivity of the fisheries, *the proposed actions would not be expected to impact the rebuilding program*." (*Id.*) (emphasis added).[13] Subsequently, in an internal "Issues Advisory Memorandum" prepared in October 2011, the Fisheries Service considered and addressed whether the proposed changes would contribute to overfishing or otherwise jeopardize the rebuilding program, explaining:

---

[13]    The Center attacks the Fisheries Service reliance on these statements, in part, because they were reputedly "dropped" from the text of the Final Rule. (Pl.'s Mem. at 8). This argument is unavailing. Not only does the Center overlook the fact that the Final Rule expressly incorporated the preamble and background discussions from the proposed rule, (AR, E13 at 1), but it also presupposes that, because these factors were not explicitly set forth in precisely the same manner in the Final Rule, that they were not reasonably examined and evaluated by the Fisheries Service during the notice and comment rulemaking process. This is not the law.

> This action may be controversial with some environmental groups, because they may perceive that it would increase BFT mortality.  However, this rulemaking is consistent with ICCAT recommendations, including the recommendation by ICCAT concerning the western Atlantic bluefin tuna rebuilding program (Rec. 10-03), which is based on total allowable catch (in weight) and assumes that the pattern of fishing mortality (e.g., fish caught at each age) will not change dramatically.  This rule would provide flexibility to affect only <u>when</u> and <u>where</u> BFT mortality occurs, and <u>not the magnitude</u> of mortality.

(AR, E1 at 3) (emphasis in original).   This same determination is contained in an internal "Decision Memorandum" prepared by the Fisheries Service in November 2011.  (AR, E7 at 1 ("This rule would provide flexibility to affect only <u>when</u> and <u>where</u> BFT mortality occurs, and does not increase the total amount to be harvested, which is limited by the ICCAT-recommended U.S. quota")) (emphasis in original).

In addition, the text of the Final Rule itself reveals several examples of the Fisheries Service's consideration of these issues.  In responding to a commenter who opined that the Final Rule "[would] increase BFT fishing mortality in addition to affecting the timing and location of catch," the Fisheries Service explained:

> NMFS has determined that, when evaluating the effect of management measures, it is important to consider time scales as they relate to the action under consideration.  Relevant scientific information, ICCAT recommendations (e.g., quotas), and the Consolidated HMS FMP are structured principally on an annual basis.  Although on a particular fishing day, a vessel may catch more or fewer BFT, the maximum fishing mortality is capped by the annual quota.  This rule modifies neither the annual quota, nor the fishing mortality associated with that quota.  Given the variability of the location of BFT, a higher daily retention limit may enable better alignment of catch with fish availability, while not increasing overall catch.

(AR, E13 at 3).  Relatedly, another commenter posited that "[e]ven if catch is within the ICCAT established quota, that level of catch could lead to accelerated stock declines and further compromise the rebuilding program." (*Id.*).  In response, the Fisheries Service explained:

> NMFS agrees that limiting fishing mortality is important.  NMFS does so within the limits of the ICCAT-recommended quota and in implementing its Magnuson-Stevens Act and ATCA obligations.  The 2011 U.S. quota is consistent with the

> current ICCAT recommended total allowable catch, which is expected to allow for continued BFT stock growth under both the low and high recruitment scenarios considered by ICCAT's Standing Committee on Research and Statistics (SCRS).

(*Id.*).   Moreover, the environmental assessment prepared in conjunction with the Final Rule squarely addresses the Fisheries Service's determination with respect to National Standard One:

> This action is consistent with [National Standard One].  This action is consistent with ICCAT recommendations, including Recommendation 10-03, which established a total allowable catch (in weight) and assumes that the pattern of fishing mortality (e.g., fish caught at each age) will not change dramatically.  This action, which is intended to enable more thorough utilization of the available quota, would provide flexibility to affect only <u>when</u> and <u>where</u> BFT mortality occurs, and does not increase the total amount allowed to be harvested, which is limited by the ICCAT-recommended U.S. quota.

(AR, E4 at 57) (emphasis in original).

In view of the foregoing, it is beyond cavil that the Fisheries Service did, in fact, evaluate whether the measures within the Final Rule complied with National Standard One's obligation to prevent overfishing.  The Center's argument that the Fisheries Service failed to even consider the issue is plainly without merit and seems borne out of an overly obtuse reading of the Administrative Record.  Consequently, the Center is left to argue, as it stridently does, that the Fisheries Service just got it wrong.

On this point, the Court pauses to reemphasize its role in reviewing the Center's claim.  It is not the Court's role to make an independent determination as to whether, in its own judgment, the Final Rule actually prevents overfishing.  Rather, the Court's task is simply to determine whether the Fisheries Service's conclusion that National Standard One was satisfied "is rational and supported by the record."  *C & W Fish Co.*, 931 F.2d at 1562; *Blue Ocean Inst.*, 585 F. Supp. 2d at 41.  Framed accordingly, the Court is convinced that the Final Rule passes this test.

Nevertheless, the Center deploys a number of arguments in an effort to discredit the Fisheries Service's decision.  On a more general level, the Center attacks the Fisheries Service's

conclusion with respect to the Final Rule as a whole by arguing that: (1) the Fisheries Service simply "assumed" that the ICCAT-recommended quota would prevent overfishing and insure rebuilding of the stock; (2) the Final Rule failed to implement a rational rebuilding plan; (3) the Fisheries Service improperly relied upon two alternative recruitment scenarios, rather than designating a single maximum sustainable yield; and (4) the Fisheries Service improperly focused on providing fishermen with a "reasonable opportunity to harvest" the applicable quota allocation. The Center also makes arguments against each of the Final Rule's measures on an individual level, asserting that: (1) the increase in the General category daily retention limit improperly amplified fishing mortality and failed to account for "dead discards"; (2) the extension of the General category fishing season unreasonably ignored the impact on the bluefin tuna's spawning efforts in the Gulf of Mexico; and (3) the increase in the Harpoon category failed to rationally account for the potential increase in bluefin mortality. None of these arguments carry the day.

For its part, the Fisheries Service insists that most of the Center's theories are nothing more than ill-suited, backdoor challenges to NMFS's adoption of the ICCAT-recommended quota—which was instated through an earlier rulemaking that the Center failed to timely challenge. There is some appeal to this argument, and the Court does not necessarily disagree that many of the Center's challenges appear to go to the heart of the Fisheries Service's overall quota limits, while masquerading as attacks on the three management measures implemented by the Final Rule. But even assuming the Center can properly rely upon these theories now, its arguments still fall far short of proving that the Fisheries Service's determination that the Final Rule satisfied National Standard One was arbitrary and capricious, rather than based on reasoned decisionmaking.

To begin with, the Fisheries Service did not simply "assume" that the ICCAT quota would reduce overfishing and blindly adopt ICCAT's recommendation, as the Center suggests. Rather, the Administrative Record establishes that the Fisheries Service reviewed and evaluated the underlying data and statistics upon which the ICCAT recommendation was based. Indeed, through its earlier rule adopting the ICCAT quota, the Fisheries Service responded to a comment that essentially raised this very concern:

> The United States is working with other ICCAT Contracting Parties to prevent BFT overfishing and overfished conditions for both stocks while providing reasonable opportunities to fish. At its 2010 annual meeting, ICCAT adopted TACs and other conservation and management measures that are within the range of scientific advice that SCRS provided to ICCAT for both the western and eastern Atlantic stocks. Over the past several years, ICCAT has taken steps to strengthen its control of the eastern Atlantic bluefin tuna fishery, including a shorter fishing season, further reductions in fishing capacity, and stronger monitoring and compliance measures. ICCAT's 2010 assessment of the eastern BFT stock indicated that maintaining catches at the current TAC will likely allow biomass to increase if compliance with the current management measures continues. The latest stock assessment concluded that the current western Atlantic TAC should allow spawning stock biomass to increase under both high and low productivity scenarios. The western Atlantic fishery also had a long history of compliance. In addition, the current ICCAT BFT recommendations for both the western and eastern stocks have a provision that would suspend all bluefin fisheries if SCRS detects a serious threat of stock collapse.

(AR, G9 at 4). Similar assessments are found elsewhere in the Administrative Record. (*See, e.g.*, AR, E1 at 2; AR, E7 at 3).[14]

The Court also finds, contrary to the Center's assertions, that the Fisheries Service rationally found the measures implemented through the Final Rule to be consistent with an appropriate rebuilding plan. (*See* Defs.' Mem. at 31-33). While the Center contends that the

---

[14]   The Court also observes that the United States is a key member of ICCAT, and is allocated more than 50% of the total allowable catch of the western Atlantic stock among all participating members. (*See* AR, G7 at 2 (outlining U.S. allocation for 2011 and 2012 fishing years as 923.7 metric tons out of 1,750 total metric tons, or 52.78%)). Thus, the notion that the Fisheries Service is somehow abdicating its decisionmaking prerogatives to some far-removed, disinterested international body is simply not accurate.

Fisheries Service's reliance on two competing "recruitment scenarios" effectively precludes such a finding, this argument is similarly unavailing.  According to the Fisheries Service, it views "the information considered by SCRS in the BFT stock assessments to constitute the best information currently available on which to make BFT fishery management decisions," (AR, G9 at 4), and the 2010 SCRS Report based its management recommendations—as was true in prior assessments—on two competing hypotheses regarding the future recruitment of the bluefin population, (AR, H6 at 83).[15]  NMFS concedes that, under the "high recruitment" scenario, the bluefin population "will not rebuild by 2019 under current fishing quotas (or even with no catch)."  (Defs.' Mem. at 31).  But under the "low recruitment" scenario, the Fisheries Service points out, SCRS projected that the bluefin fishery is already rebuilt, and the current quota levels will continue to ensure that the rebuilding plan remains viable.  (*Id.* (citing AR, E4 at 18)).  Because the SCRS described both scenarios as equally plausible, and because "there is no strong evidence to favor either the low or high recruitment scenario over the other," (AR, G7 at 1), the Fisheries Service concluded that the current rebuilding plan has at least a 50% chance of achieving the bluefin rebuilding target, (AR, G7 at 2 ("No adjustment to the annual TAC or the 20-year rebuilding period shall be considered unless SCRS advice indicates that the TAC under consideration will allow the MSY target to be achieved within the rebuilding period with a 50 percent or greater probability.")).  The rationality of this determination is supported by the Administrative Record.

---

[15]    Indeed, as the Fisheries Service rightly points out, its obligations under National Standard One cannot be viewed in a vacuum; these obligations must be viewed concurrently with NMFS's mandate under National Standard Two, to base its decisions on the "best available scientific information."  16 U.S.C. § 1851(a)(2).  In turn, the Fisheries Service maintains, its reliance on the SCRS Report's two competing "recruitment scenarios" must be afforded deference.

In addition, notwithstanding the competing recruitment models developed by the SCRS Report, the Administrative Record establishes that ICCAT recommended, and the Fisheries Service adopted, a quota level that will allow the western bluefin stock to continue to increase under either scenario.  (AR, H6 at 86).  Although the Center suggests that the Fisheries Services is statutorily obligated to specify a single "maximum sustainable yield" under a single stock assessment model, (Pl.'s Mem. at 12-15), the Center provides no authority for this proposition, and the Court is not aware of any such mandate, whether in the statute itself or otherwise.  While the Center is correct that Congress requires action to improve overfished fisheries, (Pl.'s Opp'n at 19), the Court finds no fault in the Fisheries Service's reasoned decision to pursue that objective through a rebuilding plan that ensures growth under two alternative population models. Given all this, the Court cannot say that the Fisheries Service's reliance on two recruiting scenarios—or, stated another way, its inability to identify a single "maximum sustainable yield" through one recruitment scenario versus another—was arbitrary or capricious, particularly given the heightened deference owed to decisions based on complex scientific information within the agency's particularized area of expertise.  *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989); *Am. Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 4 (D.D.C. 2000) ("Courts also give a high degree of deference to agency actions based on an evaluation of complex scientific data within the agency's technical expertise.").

The Center also assails the Fisheries Service for considering, along with its obligations to prevent overfishing under National Standard One, the Magnuson-Stevens Act's coextensive directive to "provide fishing vessels of the United States with a reasonable opportunity to harvest [the bluefin quota] allocation."  16 U.S.C. § 1854(g)(1)(D).  The Center argues that the Fisheries Service impermissibly suggests that it "could avoid compliance with [National Standard One] as

long as it was under the guise of providing U.S. fishing vessels a 'reasonable opportunity to harvest' quota." (Pl.'s Reply at 23).  The problem with the Center's argument, however, is that these statutory mandates are not mutually exclusive.  To the contrary, it is entirely reasonable—and likely exactly what Congress intended, given that it grafted these two directives into the same statutory scheme—that the Fisheries Service can prepare and implement fishery management plans that both: (1) prevent overfishing, *see* 18 U.S.C. § 1851(a)(1); and (2) permit fishing vessels a reasonable opportunity to harvest quota allocations, *id.* § 1854(g)(1)(D).  Based on the Administrative Record, this is precisely the determination that the Fisheries Service reached in this case.  In its view, the measures implemented through the Final Rule would permit fishermen in the General and Harpoon categories an opportunity to harvest their quota allocations, while preventing overfishing by leaving the existing quota levels in place.

The cases cited by the Center do not compel a different result.  First, in *Blue Water Fisherman's Ass'n v. Mineta*, 122 F. Supp. 2d 150 (D.D.C. 2000), the court considered a challenge to retention limits brought by a group of fishermen claiming that "any regulation that detracts from their ability to catch and sell their portion of the ABT quota violates National Standard One, because the fishery as a whole would not be able to achieve optimum yield each year."  *Id.* at 161-62.  In rejecting that argument, the court emphasized the competing objectives of National Standard One—which is aimed at "achiev[ing] optimum yield *while preventing overfishing*"—and explained that the Act does not provide fishermen with an unbounded entitlement to catch their allotted quota; instead, the Fisheries Service must remain able to implement reasonable conservation measures designed to prevent overfishing.  *Id.* at 161 (emphasis in original).  Thus, contrary to the Center's interpretation of this decision, the case does not stand for the proposition that the Fisheries Service can *never* consider the ability of

fishermen to achieve their allotted quota, but only that the Fisheries Service should do so in a manner that also adheres to its coequal responsibility to prevent overfishing.  As set forth above, the Fisheries Service engaged in precisely this sort of balancing when it published the Final Rule. In addition, *Blue Water Fisherman's Ass'n v. National Marine Fisheries Service*, 226 F. Supp. 2d 330 (D. Mass. 2002), is equally distinguishable.  There, the court simply concluded that the ATCA did not guarantee a particular group of fishermen the right to obtain their quota allocations, to the exclusion of other conservation objectives by the Fisheries Service.  *Id.* at 344. That decision in no way undermines the validity of the Final Rule, which the Fisheries Service concluded would continue to prevent overfishing through the overall fishing cap imposed by the quota, while affording the General and Harpoon categories an opportunity to more effectively harvest their allotted catch within that quota.

The Court also finds the Center's arguments with respect to each of the individual management measures—which only appeared for the first time in the Center's opposition brief, (Pl.'s Opp'n at 14-19)—to be similarly unavailing.  The Center first attacks the Final Rule's increase in the General category daily retention limit, arguing that this change will result in greater fishing mortality and will contribute to overfishing.  (*Id.* at 14-16).  But the Administrative Record provides ample support for the Fisheries Service's finding to the contrary. First, it bears noting that the Final Rule only changed the maximum *possible* daily retention limit for the General category to five fish per vessel (an increase from the previous maximum *possible* limit of three).  (AR, A9 at 2-3; AR, E13 at 2).  Under applicable regulations, the Fisheries Service then has the ability to set and adjust the daily retention limit at any time throughout the fishing season, within the range of zero to five fish per vessel.  (AR, E13 at 2).  As a consequence, the Fisheries Service reasonably concluded that "the limited nature of this action,

particularly given the relatively low General category success rate in retaining the current maximum daily retention limit of three fish, is unlikely to have any different impacts on the life history or overall biological distribution of the western Atlantic BFT stock." (AR, E4 at 26-27).[16] Moreover, the Center's argument that the Fisheries Service failed to account for "dead discards" seems to deliberately ignore the Administrative Record, which clearly establishes that the ICCAT-recommended quota—and, in turn, the bluefin quota adopted by the Fisheries Service—is inclusive of "dead discards." (AR, G7 at 2 ("The rebuilding program for bluefin tuna in the western Atlantic . . . will have a total allowable catch (TAC), *inclusive of dead discards*, of 1,750 [metric tons] in 2011 and in 2012.")) (emphasis added).

Second, the Center argues that the Final Rule's extension of the General category fishing season will jeopardize the ability of bluefin to spawn in the Gulf of Mexico, given the anticipated geographical shift southward toward the Gulf during the extended fishing season. (Pl.'s Opp'n at 16-18). More specifically, the Center asserts that, in extending the season, the Fisheries Service improperly disregarded ICCAT's recommendation to protect the 2003 year bluefin class until it can spawn. (*Id.*). To begin with, it should not go unnoticed that the Center's argument is internally inconsistent—given that it faults the Fisheries Service for ostensibly ignoring an ICCAT recommendation in this instance, while repeatedly attacking the Fisheries Service for adopting ICCAT recommendations with respect to other issues. But the Center's inconsistency aside, this theory simply fails to establish that the Fisheries Service's decision to extend the

---

[16]     In this respect, the Fisheries Service considered historical statistics from the 2008 fishing year, which showed that only four percent (4%) of fishing trips by General category vessels had landed and retained the maximum harvest of three bluefin tuna. (AR, E4 at 25). By contrast, the vast majority of trips in the General category—eighty-three percent (83%)—landed and retained only one bluefin tuna. (*Id.*). Given the fact that such a small percentage of fishing trips in the General category retained the maximum harvest under the earlier retention limits, it was entirely reasonable for the Fisheries Service to conclude that this potential increase would have a minimal impact on the fishing effort in the General category.

General category season was flawed.   According to the Fisheries Service, it ensures the continued growth of the bluefin population through the use of "quotas as a management tool to protect all age/size classes of legal sized bluefin tuna, rather than attempting to provide further protections to specific year classes."   (Dkt. No. 27 ("Defs.' Reply") at 9).   The Center simply fails to present evidence to undermine the reasonableness of this approach.   *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) (explaining that courts must "avoid[] all temptation to direct the agency in a choice between rational alternatives").

Furthermore, the impact of the General category fishing season extension is not as far-reaching as the Center would suggest.   The Final Rule simply extended the fishing period for the January subquota until that subquota is reached, or until March 31st, whichever occurs first. (AR, E13 at 2).   As a practical matter, therefore, the Fisheries Service estimated that "this action effectively would lengthen the General category season by a few weeks." (AR, A9 at 4).   In fact, as the Fisheries Service points out, the January 2012 subquota was reached on January 22, 2012, at which time the fishery was closed until June 1, 2012.   (AR, S19).   Similarly, this past year, the General category fishery closed well before the end of March, on February 15, 2013.   *See* 78 Fed. Reg. 11,788 (Feb. 14, 2013).   Furthermore, the January subquota only makes up a very small percentage (approximately 5.3%) of the General category's overall subquota, (AR, G9 at 3), which bolsters the Fisheries Service's determination that this extension would have a minimal impact on overall fishing effort and bluefin mortality.   Finally, the Court also notes that NMFS initially contemplated extending the season until the January subquota was reached, or until May 31st, whichever occurred earlier.   (*Id.*).   However, in response to feedback received during the notice and comment process, that "the majority of fish available to the fishery during this period . . . are primarily adolescents, interspersed with mature western BFT on their way to the Gulf of

Mexico to breed," the Fisheries Service shortened that proposed extension and modified its action to "mitigate any potential impacts to the species of any additional fishing effort during months previously unfished."  (AR, E13 at 2, 4).  This response further evidences the Fisheries Service's reasoned efforts to prevent overfishing in connection with the Final Rule.

Lastly, the Center argues that the Final Rule's increase of the daily retention limit for the Harpoon category, from two fish to four fish per vessel, results in greater fishing mortality and therefore fails to prevent overfishing.  (Pl.'s Opp'n at 18-19).  The Fisheries Service responds that, in its estimation, this action will not significantly increase fishing mortality and is constrained by the overall fishing quota in any event, which NMFS determined appropriately prevented overfishing.  (Defs.' Reply at 9-10).  This determination is amply supported by the Administrative Record, particularly given that the Harpoon category only accounts for less than four percent (4%) of the overall U.S. quota allocation.  (AR, G9 at 3 (allocating the Harpoon category a total base subquota of 36 metric tons, out of 923.7 metric tons, for the 2011 and 2012 fishing years)).  The Center simply fails to present any evidence that demonstrates otherwise.

As a final matter, the Court observes that the Administrative Record also contains additional support—separate and apart from the specific arguments advanced by the Center—for the Fisheries Service's position that it reasonably and rationally evaluated whether the Final Rule complied with National Standard One.  For one, the Fisheries Service delayed implementation of the Final Rule to allow for the completion of SCRS's 2010 stock assessment of bluefin tuna, as well as a decision on a petition to list bluefin tuna as threatened or endangered under the Endangered Species Act.  (AR, B3 at 1-2; AR, E13 at 1-2).[17]  In the Court's view, this postponement lends support to the notion that NMFS based its decision on the most up-to-date

---

[17]     Coincidentally, the Endangered Species Act petition was filed with the Secretary of Commerce by the Center for Biological Diversity.  (*See* AR, H4).

information concerning the status of the bluefin tuna stock.  Additionally, although covered through some of the Court's earlier discussion, it bears emphasis that the effort controls implemented through the Final Rule are relatively minor adjustments to the Fisheries Service's overall management of the bluefin tuna fishery.  The changes only impact the General and Harpoon categories—which, together, make up only about 50% of the U.S. commercial bluefin industry, (AR, G9 at 2-3)—and even then, the Final Rule only touches on discrete management measures within those categories—daily retention limits and a brief extension of the fishing season.  As a consequence of the minor nature of these changes, the Fisheries Service's determination that these changes were unlikely to upend its existing efforts to prevent overfishing—*vis-à-vis* the quota limits and the existing rebuilding plan—is all the more reasonable.

Ultimately, the Center simply fails to demonstrate that the Fisheries Service ran afoul of its obligation under National Standard One to prevent overfishing.  At bottom, the Center principally inveighs against the Fisheries Service's substantial reliance on the use of quota limits and the ICCAT rebuilding plan, but the Administrative Record amply supports the Fisheries Service's conclusion that, because the effort controls challenged in this lawsuit all fall within the overall quota and subquota limits previously implemented (and are relatively minor in and of themselves), the Fisheries Service fully complied with its obligation to prevent overfishing.  While the Center may disagree with that assessment, its arguments essentially "amount to nothing more than competing views about policy and science, on which [the Court] defer[s] to the agency." *In re Polar Bear Endangered Species Act Listing*, --- F.3d. ---, 2013 WL 765059, at *7 (D.C. Cir. Mar. 1, 2013).  Because the Fisheries Service's determination was the product of

reasoned decisionmaking and is plainly supported by the Administrative Record, the Court will not disturb that result.  The Center's challenge under National Standard One fails.

### 2.  __National Standard Two__

National Standard Two of the Magnuson-Stevens Act prescribes that "[c]onservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  "Scientific information," as defined in the regulations, "includes, but is not limited to, information of a biological, ecological, economic, or social nature."  50 C.F.R. § 600.315(b)(1).  Phrased differently, National Standard Two "requires that rules issued by the [Fisheries Service] be based on a thorough review of all the relevant information available at the time the decision was made, and insures that the [Fisheries Service] does not disregard superior data in reaching its conclusion."  *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 85 (quoting *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005), *aff'd* 488 F.3d 1020 (D.C. Cir. 2007)).  This "is a practical standard requiring only that fishery regulations be diligently researched and based on sound science."  *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 61 (D.D.C. 2012).  As a result, legal challenges under National Standard Two are "frequently unsuccessful," and "[a]bsent some indication that superior or contrary data was available and that the agency ignored such information, a challenge to the agency's collection of and reliance on scientific information will fail."  *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 85 (collecting cases).

In contesting the Fisheries Service's compliance with National Standard Two, the Center deploys two principal arguments: (1) that the Fisheries Service failed to consider the impact of "illegal fishing" on rebuilding efforts; and (2) that the Fisheries Service failed to take into account an alternative population model: the Multistock Age-Structured Tag-integrated ("MAST") stock assessment model.  Both of these arguments lack merit.

33

First, the Center contends that the Fisheries Service improperly ignored the fact that "illegal fishing has continued to undermine the effectiveness of quotas to limit fishing mortality." (Pl.'s Mem. at 21-22).   In so arguing, the Center points to a report published by the Pew Environment Group in October 2011, which indicates that the Mediterranean catch of bluefin tuna in 2009 and 2010 was "more than double the quota" set by ICCAT.  (*See* AR, S5).  The Center also relies on a July 2011 Notice issued by the Fisheries Service, advising that "Libyan vessels may not be meeting ICCAT requirements for Atlantic bluefin tuna fishing in the Mediterranean," i.e., that bluefin were being "illegally harvested."  *See* 76 Fed. Reg. 38,620 (July 1, 2011).  In response, the Fisheries Service contends that, in its view, this information—which concerns the fishing of *eastern Atlantic stock* in the Mediterranean—has little relevance to the management of the U.S. quota allocation of *western Atlantic bluefin*.  (Defs.' Mem. at 39).  The Administrative Record lends support to this view.  While all parties agree that some mixing of the eastern and western stocks is known to occur, (*see* Pl.'s Mem. at 4; Defs.' Mem. at 8-9), even the literature relied upon by the Center makes clear that "the nature and extent of mixing is still not well understood despite several years of research using various methods," (AR, H7 at 58). Therefore, even assuming that indications of illegal fishing in the Mediterranean constitute the type of "scientific information" that must be considered under National Standard Two, in light of the inconclusive scientific understanding of the interplay between the eastern and western bluefin tuna stocks, the Court cannot say that the two particular sources cited by the Center constitute "superior or contrary data" that the Fisheries Service failed to evaluate.

With respect to the issue of illegal fishing in the Mediterranean more generally, the Fisheries Service responds that these potential concerns were taken into account in connection with the Final Rule.  More specifically, the Fisheries Service points to ICCAT's 2010 SCRS

Report, which indicated that while the 2005 and 2007 Mediterranean catches were well above the quota amounts due to underreporting (i.e., illegal fishing), the reported catches in 2008 and 2009 were substantially lower than in previous years. (AR, H6 at 78).  As set forth in the SCRS Report, the Committee believed those changes to have been achieved "through implementation of the rebuilding plan and *through monitoring and enforcement controls*."  (*Id.*) (emphasis added).  Since the Fisheries Service substantially relied upon this SCRS Report in promulgating the challenged rule, NMFS disputes the Center's assertion that it ignored these concerns, insisting instead that it properly considered information surrounding illegal and unreported catches in the Mediterranean.  (*See* Defs.' Mem. at 39; *see also* AR, H8 at 57 ("Because the action is based on the results of the 2008 ICCAT recommendation and 2008 landings data, as updated by the 2010 ICCAT recommendation and landings data, it is based on the best scientific information available.")).  While perhaps not discussed as thoroughly or openly as the Center would have liked, the Court cannot say that the Fisheries Service failed to consider this information in connection with the Final Rule.[18]

Second, the Center argues that the Fisheries Service should have looked to an alternative stock assessment model—the MAST population model—to evaluate the bluefin tuna population before implementing the Final Rule.  (Pl.'s Mem. at 22-24).  It asserts that the Fisheries Service's "blind adherence" to the SCRS report published by ICCAT violated its obligations under National Standard Two.  (Pl.'s Reply at 25).  In response, the Fisheries Service explains that it considers the stock assessments prepared by SCRS to constitute "the best information currently available on which to make [bluefin tuna] fishery management decisions."  (Defs.' Mem. at 40

---

[18]     The Court also observes that the Center essentially jettisons this argument through its subsequent briefing, instead focusing its National Standard Two challenge concerning the Fisheries Service's disregard for the MAST population model.  (*See* Pl.'s Opp'n at 25-27).

(quoting AR, G9 at 4)).   According to the Fisheries Service, it did not consider the alternative MAST stock model to be the best information available, among other reasons, because the final results of that model were not published until December 2011—the month after the Final Rule was issued.   (Defs.' Mem. at 40) ("Although this model may warrant further consideration in future stock assessments, it did not constitute the 'best available scientific information' when NFMS published the challenged final rule.").   The Center does not dispute this latter fact.   (Pl.'s Reply at 25-27).   In turn, the Center's argument—essentially a suggestion that the Fisheries Service should have relied on a model that was not even finalized at the time—borders on the frivolous.   *See* 50 C.F.R. § 600.315(b)(2) (explaining that management plans and regulations "must take into account the best scientific information available *at the time of preparation*") (emphasis added).

But even if the full results of the MAST model had been available at the time, it is well established that NMFS "may choose" between "conflicting facts and opinions," so long as it "justif[ies] the choice."   *Fisherman's Finest, Inc. v. Locke*, 593 F.3d 886, 890 (9th Cir. 2012) (quoting 50 C.F.R. § 600.315(b)(1)).   Indeed, given the highly scientific and specialized nature of this type of judgment call, it is "especially appropriate for the Court to defer to the expertise and experience of . . . the Secretary the Councils, and their advisors—whom the Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors."   *Nat'l Fisheries Inst.*, 732 F. Supp. at 223 (citing *Pittston Coal Grp. v. Sebben*, 488 U.S. 105, 109 (1988)).   The Center also criticizes the Fisheries Service's reliance on the SCRS Report "in light of the report's contradictions with respect to rebuilding" and certain internal errors regarding overfishing statistics.   (Pl.'s Reply at 25-26).   However, this argument is unavailing because,

even assuming that the SCRS Report may have contained some inaccuracies, this would not render NMFS's reliance on the Report violative of National Standard Two.  Indeed, "[i]t is well settled . . . that the Secretary can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed."  *Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106, 115 (3d Cir. 2011) (quoting *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 85) (alteration in original).

Ultimately, the Administrative Record reflects reasoned decisionmaking on the part of the Fisheries Service with respect to its compliance with National Standard Two, and the Center simply fails to clear the "high hurdle" of proving that the agency ignored "superior or contrary" scientific information in enacting the Final Rule challenged in this case.  *N.C. Fisheries Ass'n*, 518 F. Supp. 2d at 85.  Accordingly, the Court finds that the Final Rule comports with National Standard Two of the Magnuson-Stevens Act.

### E.  The National Environmental Policy Act

Under NEPA, federal agencies are obligated to "consider fully the environmental effects of their proposed actions."  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (*"Theodore Roosevelt I"*).  Generally speaking, "NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for 'every . . . major Federal action[] significantly affecting the quality of the human environment.'"  *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002) (quoting 42 U.S.C. § 4332(2)(C)) (alterations in original).  "An agency can avoid preparing an EIS, however, it if conducts an [e]nvironmental [a]ssessment and makes a [f]inding of [n]o [s]ignificant [i]mpact."  *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012) (internal citations omitted).  This was the result here: the Fisheries

Service prepared an EA and issued a finding of no significant impact ("FONSI") in conjunction with the Final Rule challenged by the Center.

In reviewing an agency's decision to issue an EA and a FONSI—and, in turn, to not prepare an EIS—the Court's role "is a limited one, designed primarily to ensure 'that no arguably significant consequences have been ignored.'" *TOMAC v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006) (quoting *Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1998)).   The Court's role is circumscribed in this fashion because "[t]he evaluation of the impact of those consequences on the quality of the human environment is left to the judgment of the agency." *Id.* at 860-61.   As our Circuit has succinctly explained, the Court is tasked with determining whether the agency:

> (1) has "accurately identified the relevant environmental concern," (2) has taken a "hard look" at the problem in preparing its EA, (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because "changes or safeguards in the project sufficiently reduce the impact to a minimum."

*Id.* at 861 (quoting *Town of Cave Creek*, 325 F.3d at 327).   While it is not the Court's place to "'flyspeck' an agency's environmental analysis," *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011) (*"Theodore Roosevelt II"*), the Court must nevertheless "ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious," *id.* (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

NEPA's implementing regulations also "require an agency to evaluate 'cumulative impacts' along with the direct and indirect impacts of a proposed action." *TOMAC*, 433 F.3d at 864 (citing *Grand Canyon Trust*, 290 F.3d at 341, 345).   A "cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency

. . . or person undertakes such other actions."   40 C.F.R. § 1508.7.   Stated another way, a "cumulative impacts analysis" is "a measurement of the effect of the current project along with any other past, present, or likely future actions in the same geographic area."   *TOMAC*, 433 F.3d at 864.   Simply stated, this requirement ensures that an agency does not "treat the identified environmental concern in a vacuum."   *Id.* (quoting *Grand Canyon Trust*, 290 F.3d at 346).

In attacking the EA prepared by the Fisheries Service in this case, the Center challenges the EA's "cumulative impacts" analysis, arguing that the Fisheries Service failed to take a sufficiently hard look at the environmental impact of two particular issues: (1) the continuing development of the oil and gas industry in the Gulf of Mexico—the spawning ground for western Atlantic bluefin—specifically, the impact of the *Deepwater Horizon* spill; and (2) evidence of illegal bluefin fishing and underreported catches in the Mediterranean.   (Pl.'s Mem. at 26-28). For its part, the Fisheries Service argues that it adequately addressed these impacts for purposes of NEPA and that the type of detailed, comprehensive analysis that the Center demands was unnecessary given the uncertainty surrounding the effects of both issues.   (Defs.' Mem. at 41- 44).   On balance, and based upon a review of the EA itself and the Administrative Record more broadly, the Court agrees that the Fisheries Service met its obligations under NEPA.

The Center's chief complaint surrounding these two issues appears to be that the Fisheries Service did not specifically address them in the cumulative impacts section of the EA. (Pl.'s Mem. at 26 ("Despite the Fisheries Service's apparent recognition of the broad scope of the required analysis, its cumulative impacts section fails to provide the requisite analysis."); *id.* ("The cumulative impacts section [of the EA] fails even to mention many factors that are having and are likely to continue having harmful effects on bluefin tuna, like oil and gas development in the bluefin tuna's spawning habitat and overfishing of eastern bluefin."); *id.* at 28 ("The

cumulative impact of this widespread overfishing needs to be analyzed in the cumulative impacts section before it can be said that the Fisheries Service has taken a hard look at the issues here.")). But this argument relies on far too cabined a reading of NEPA's requirements.  In ensuring an agency's compliance with NEPA, the Court is not strictly confined to the portion of an environmental assessment labeled "cumulative impacts analysis," or even to the four corners of the EA or EIS more broadly.  *See, e.g.*, *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 716-17 (10th Cir. 2010); *Crosby v. Young*, 512 F. Supp. 1363, 1371 (E.D. Mich. 1981) ("The review of the sufficiency of an agency's environmental impact statement is not limited to the four corners of the final EIS.").  Rather, "a court must review the entire administrative record before it, including the external documents incorporated by reference into the final [EA]." *Crosby*, 512 F. Supp. at 1371.

According to the Fisheries Service, it "accurately identified all relevant environmental concerns," and "briefly address[ed] the issues of concern identified by Plaintiff in its NEPA argument, including the impacts of the Deepwater Horizon BP oil spill and overfishing of eastern Atlantic bluefin tuna stocks."  (Defs.' Mem. at 41).  The Fisheries Service necessarily concedes that its discussion of these issues was sparse.  Given the scientific and ecological uncertainty surrounding both issues, however, the Fisheries Service contends that its "cumulative impacts analysis was adequate in light of available scientific information concerning these issues."  (*Id.* at 42).  "NEPA does not require federal agencies to examine every possible environmental consequence.  Detailed analysis is required only where impacts are likely." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.C. Cir. 1981); *see also Davis Mountains Trans-Pecos Heritage Ass'n v. FAA*, 116 F. App'x 3, 15 (5th Cir. 2004) ("In light of the Air Force's non-arbitrary conclusion that adverse effects on livestock were unlikely, we find the Air Force's

limited discussion of measures to mitigate those effects reasonable."). Where impacts are not likely, "expensive and time-consuming studies are not necessary. So long as the [EA] identifies areas of uncertainty, the agency has fulfilled its mission under NEPA." *Izaak Walton League of Am.*, 655 F.2d at 377; *Biodiversity Conservation Alliance v. United States BLM*, 404 F. Supp. 2d 212, 218 (D.D.C. 2005) ("The EA is not rendered unlawful simply because the [agency] could have considered more impacts."); *So. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102, 117 (D.D.C. 2004) ("Plaintiffs' contention that they would have done more does not render the cumulative impacts analysis violative of NEPA.") (internal citation and quotation omitted).

Here, the Administrative Record supports the Fisheries Service's conclusion that, given the uncertainty surrounding the two environmental impacts identified by the Center, a detailed discussion of these factors in the environmental assessment was not warranted. With respect to the *Deepwater Horizon* spill, the Endangered Species Act Listing Determination prepared by the Fisheries Service in May 2011—just a few months prior to the promulgation of the Final Rule— concluded that the impacts of the spill on the bluefin tuna population remained undetermined. (AR, H8 at 9 ("NOAA's Natural Resources Damage Assessment (NRDA) team . . . is conducting targeted analysis on the effects of the spill on tuna, but most of those analyses are not yet available."); *id.* ("[I]t is not possible to determine the level of impact on [bluefin] adults from the DWH oil spill at this time . . ."); *id.* at 14-15 ("[I]nformation on the larval and adult mortality from the DWH oil spill is not certain . . ."); *id.* at 15 ("Because of the remaining uncertainties regarding the effects of the DWH oil spill, we will add the blue tuna to our Species of Concerns list.")). As a result, it was reasonable for the Fisheries Service to identify this uncertainty without preparing a detailed analysis on the cumulative effects of the oil spill. The same is true with respect to the Center's contention that the Fisheries Service failed to take a sufficiently

"hard look" at the effects of illegal fishing in the Mediterranean.  As stated, the impact of this issue necessarily depends upon the mixing of the eastern and western Atlantic stocks, but the Administrative Record establishes that "the nature and extent of mixing is still not well understood despite several years of research using various methods." (AR, H7 at 58).

Finally, on a broader level—and taking a step back from the particulars of the parties' NEPA arguments—the Court again stresses the limited nature of the management measures implemented through the Final Rule.  If the Final Rule had increased (or otherwise modified) the overall bluefin tuna quota limits, then the concerns raised by the Center may have merited a more robust analysis in the Fisheries Service's EA.  But as it stands, the Final Rule simply made minor adjustments to effort control measures within the bounds of preexisting quota limits, and only with respect to a limited subset of the commercial bluefin fishing industry.  Again, the Fisheries Service need not have examined "every possible environmental consequence," *Izaak Walton League of Am.*, 655 F.2d at 377, and the EA prepared to support the Final Rule establishes that the Fisheries Service reasonably evaluated the environmental consequences of its actions and the potential alternatives.  This was sufficient to discharges its mandate under NEPA.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court concludes that the Center's Motion for Summary Judgment is **DENIED**, and that Defendants' Cross-Motion for Summary Judgment is **GRANTED**.  An appropriate Order accompanies this Memorandum Opinion.


Date:  March 28, 2013

                                     _____
                                     ROBERT L. WILKINS
                                     United States District Judge